1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  VICTOR BENITEZ,                              CV F   06-1899 OWW DLB HC

10                    Petitioner,        FINDINGS AND RECOMMENDATION
                                         REGARDING PETITION FOR WRIT OF
11        v.                             HABEAS CORPUS

12                                       [Doc. 1]
     SCOTT P. RAWERS, Warden,
13
                      Respondent.
14  _____/

15
        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
16
     pursuant to 28 U.S.C. § 2254.
17
                                BACKGROUND
18
        Petitioner is currently in custody of the California Department of Corrections and
19
     Rehabilitation (CDCR), following his conviction in the Superior Court of Fresno County for first
20
     degree murder in violation of California Penal Code section 187, and assault with the intent to
21
     commit murder in violation of California Penal Code section 217.  (Exhibit 1, Abstract of
22
     Answer, attached to Answer.)
23
        In the instant petition, Petitioner does not challenge the propriety of his conviction; rather,
24
     he challenges Governor Davis' 2004 reversal of the Board of Prison Hearings' (BPH) 2004
25
     decision finding him suitable for parole.
26
        On March 21, 2005, Petitioner filed a state habeas corpus petition in the California
27
     Supreme Court.  (Exhibit 6, attached to Answer.)  The California Supreme Court summarily
28

1

1    denied the petition on July 26, 2006.  (Id.)

2         Petitioner filed the instant federal petition for writ of habeas corpus on December 29,

3    2006.  (Court Doc. 1.)  Respondent filed an answer to the petition on July 2, 2007, and Petitioner

4    filed a traverse on August 1, 2007.  (Court Docs. 13, 14.)

5                                   STATEMENT OF FACTS[1]

6         Petitioner asked his cousin Valentine Sanchez if he could have a ride to the town of

7    Sanger.  Mr. Sanchez agreed to give his cousin a ride to Sanger and he, Ramon Alonzo,

8    [Petitioner], and [Petitioner's] unidentified associate then entered Mr. Sanchez' car.  Sanchez

9    drove, while Sanchez' roommate, Ramon Alonzo, sat in the passenger seat, and Petitioner sat

10   behind Alonzo.  As they drove, Petitioner directed Sanchez to drive down a dirt road and pull

11   over.  Without saying anything, Petitioner then placed a gun on the back of Sanchez's head and

12   shot him, killing him instantly.  Petitioner also attempted to shoot Alonzo, however, the gun

13   misfired and he managed to get away.  Petitioner evaded arrest for five years.  Petitioner claimed

14   that the murder occurred because of his belief that Sanchez had killed his brother in Mexico in

15   1969.

16                                        DISCUSSION

17   I.    Standard of Review

18        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

19   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

20   enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries

21   v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th

22   Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy,

23   521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).

24   The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its

25   provisions.

26        Petitioner is in custody of the California Department of Corrections pursuant to a state

27

28   _____

     [1] The statement of facts are taken from the Probation Officer's Report, attached as Exhibit 3, to Answer.

                                             2

court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging his underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.

at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), cert. denied, 537 U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

Petitioner raised the instant claims by way of state petition for writ of habeas corpus filed in the California Supreme Court, which was summarily denied.  (Exhibit 6, attached to Answer.) AEDPA's strict standard of review is relaxed when the state court reaches a decision on the merits but provides no reasoning to support its conclusion. Under such circumstances, the federal court must "independently review the record to determine whether the state court clearly erred in its application of Supreme Court law." Brazzel v. Washington, 491 F.3d 976, 981 (9th Cir.2007), quoting Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir.2002); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.2000) ("Federal habeas review is not de novo when the state court does not supply

1  reasoning for its decision, but an independent review of the record is required to determine

2  whether the state court clearly erred in its application of controlling federal law.").

3  II.    Review of Claims

4       A parole release determination is not subject to all of the due process protections of an

5  adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9ᵗʰ Cir. 1987); see

6  also Greenholtz v. Inmates of Nebraska Penal and Corr. Complex, 442 U.S. 1, 12 (1979)

7  (explaining that due process is flexible and calls for procedural protections that particular

8  situations demand). "[S]ince the setting of a minimum term is not part of a criminal prosecution,

9  the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated,

10  even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of

11  Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, an inmate is

12  entitled to the following procedural protections: 1) the inmate must receive advance written

13  notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an "opportunity to

14  be heard," Greenholtz, 442 U.S. at 16; and 3) if the inmate is denied parole, the inmate must be

15  told why "he falls short of qualifying for parole." Id.

16       As to these procedural protections, as Respondent submits, Petitioner was provided all

17  that is required.  Petitioner was provided with advance notice of the hearing, an opportunity to

18  submit materials for the Board's consideration, an opportunity to be heard during the hearing,

19  representation by his attorney, and a written decision explaining the reasons that parole was

20  denied.

21       "In Superintendent, Mass. Correc. Inst. v. Hill, the Supreme Court held that 'revocation

22  of good time does not comport with 'the minimum requirements of procedural due process,'

23  unless the findings of the prison disciplinary board are supported by some evidence in the

24  record.'  472 U.S. 445, 454 (1985), quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)."

25  Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128 (9ᵗʰ Cir.2006) (italics added). The

26  Ninth Circuit has held that this same standard also extends to parole determinations. Hayward v.

27  Marshall, 512 F.3d 536, 542 (9ᵗʰ Cir.2008), citing Irons v. Carey, 505 F.3d 846, 851 (9ᵗʰ

28  Cir.2007), quoting Hill, 472 U.S. at 457 ("We have held that 'the Supreme Court ha[s] clearly

1    established that a parole board's decision deprives a prisoner of due process with respect to this

2    interest if the board's decision is not supported by 'some evidence in the record,' or is 'otherwise

3    arbitrary.'"). In assessing "whether a state parole board's suitability determination was supported

4    by 'some evidence' in a habeas case, our analysis is framed by the statutes and regulations

5    governing parole suitability determinations in the relevant state." Hayward, 512 F.3d at 542,

6    *quoting* Irons, 505 F.3d at 851. Here, the Court must look to California law and review the

7    record. In reviewing the record and determining whether the "some evidence" standard is met,

8    the Court need not examine the entire record, independently assess the credibility of witnesses, or

9    re-weigh the evidence. Sass, 461 F.3d at 1128.

10    California law provides that after an inmate has served the minimum term of confinement

11    required by statute, the Board "shall set a release date unless it determines that the gravity of the

12    current convicted offense or offenses, or the timing and gravity of current or past convicted

13    offense or offenses, is such that consideration of the public safety requires a more lengthy period

14    of incarceration for" the prisoner. Cal. Penal Code § 3041(b). "[I]f in the judgment of the panel

15    the prisoner will pose an unreasonable risk of danger to society if released from prison," the

16    prisoner must be found unsuitable and denied parole. Cal. Code Regs. tit. 15, § 2402(a). The

17    Board decides whether a prisoner is too dangerous to be suitable for parole by applying factors it

18    has set forth in the California Code of Regulations.

19    To determine whether "some evidence" supports the state court decision, the test is not

20    whether some evidence supports the reasons cited for denying parole, "but whether some

21    evidence indicates a parolee's release unreasonably endangers public safety." Hayward, 512 F.3d

22    at 543, *quoting* In re Lee, 143 Cal.App.4th 1400, 1408 (Cal.Ct.App.2006).

23    Article 5, section 8(b) of the California Constitution, allow the Governor to review the

24    decision of the BPH and enables him to affirm, modify, or reverse the decision on the basis of the

25    same factors that the BPH is required to consider.  See Cal. Const. art. 5, § 8(b); In re

26    Rosenkrantz, 59 P.3d 174, 210 (Cal. 2002).  Accordingly, the Governor's decision to reverse a

27    parole grant is reviewed under the same due process principles utilized to review the BPH's

28    denial of parole.

1    At Petitioner's ninth 2004 parole hearing, the BPH found that Petitioner was suitable for

2 parole and did not pose an unreasonable risk of danger to society or a threat to public safety if

3 released based on Petitioner's lack of juvenile record, receipt of GED in 1986, extensive

4 participation in self-help and/or therapy programs, participation in Alcoholics Anonymous since

5 1996, receipt of certificate of completion from the Men's Violence Potential Prevention Program

6 in 1997, completion of auto mechanics and auto service specialist in 1989, completion of 6,900

7 hours in mill and cabinet making, realistic parole plans including a job offer and family support

8 in Mexico, positive institutional behavior having suffered no rules violations since 1989, sincere

9 remorse and acceptance of responsibility, and a psychological report finding him a very low risk

10 of violence if released.  See Exhibit 5, at 67-77.

11    Governor Schwarzenegger reversed the BPH's 2004 parole grant finding in relevant part:

12         Regardless of when [Petitioner] formed his murderous intent, he
          indisputably stewed for a period of time before shooting Mr. Sanchez execution-
13        style in the back of the head.  And [Petitioner] did not stop there.  After murdering
          Mr. Sanchez, he pointed the gun at Mr. Olivo's face and pulled the trigger.  Mr.
14        Olivo was spared only because the gun misfired.  According to the probation
          officer, [Petitioner] attacked Mr. Olivo to eliminate him as a witness.  [Petitioner]
15        murdered in cold blood one man–his own cousin–and tried to murder another; his
          conduct went beyond the minimum necessary to sustain a conviction for first-
16        degree murder.  It is sufficient to conclude on this basis alone that [Petitioner]
          would pose an unreasonable risk to society if paroled at this time.  Moreover,
17        although [Petitioner] says that he is remorseful and takes responsibility for what
          he did to Mr. Sanchez and to Mr. Olivo, he at his 2004 hearing denied that he
18        tried to shoot Mr. Olivo.  According to the appellate court, however, "[Mr.
          Benites's] striking Olivo twice over the head with the pistol indicates his
19        frustration the gun would not fire, and further evidences an intent to kill Olivo."

20 Exhibit 2, attached to Answer.

21    As evidenced above, in reversing the BPH's grant of parole, the Governor relied

22 *exclusively* on the circumstances of Petitioner's commitment offense.  Recent Ninth Circuit cases

23 have called into doubt the reliance on such circumstances.  In Biggs v. Terhune, 334 F.3d 910,

24 916-17 (9th Cir.2003), the Ninth Circuit stated that "[a] continued reliance in the future on an

25 unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

26 contrary to the rehabilitative goals espoused by the prison system and could result in a due

27 process violation." The Ninth Circuit reaffirmed its holding in Biggs in the case of Irons v.

28 Carey, where it stated that although a denial of parole initially can be justified by relying on the

7

gravity of the offense, over time, "should [the prisoner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole." Irons v. Carey, 505 F.3d 846, 853 (9th Cir.2007), *citing* Biggs, 334 F.3d at 916. This point was recently restated in Hayward v. Marshall, 512 F.3d at 536.  In both Biggs and Irons, the Ninth Circuit upheld the denials of parole based solely on the commitment offense, because in each of these cases the prisoner had not yet served the minimum term of his sentence.

In Hayward, however, the Ninth Circuit reversed the denial of parole finding the commitment offense, in light of the extraordinary circumstances of the case, no longer had predictive value regarding the prisoner's suitability for parole.  There, Hayward, along with other members of a motorcycle gang, confronted a man at a bar "who, according to conflicting accounts, had either slapped or battered and attempted to rape Hayward's girlfriend (who would later become Hayward's wife).  The confrontation turned physical and ended after Hayward stabbed the man twelve times, killing him.  In 1980, a California jury convicted Hayward of second degree murder, and the court sentenced him to state prison for a term of fifteen years to life." Hayward, 512 F.3d at 538.  Hayward was denied parole by the Governor on the eleventh hearing.  At that time he had served twenty-seven years in prison on a sentence of fifteen years-to-life, he was sixty-four years old, and the Board had twice recommended that Hayward receive a parole date.  However, former Governor Davis reversed the Board's second grant of parole based on seven factors, four of which were not supported by the record and three of which were based on the immutable factors of the commitment offense. The Ninth Circuit found that in light of Hayward's "rehabilitation by education and conduct while imprisoned and the Board's successive favorable view of his application for release, Hayward's commitment offense, which occurred twenty-five years ago, cannot demonstrate that Hayward's release will pose an imminent danger to public safety." Hayward, 512 F.3d at 546.

This Court finds that the circumstance of the instant case present as much of a compelling case for Petitioner's release as the circumstances present in Hayward.  Petitioner has previously been granted parole on three separate occasions (1986, 1992, 2002). (Exhibit 5, at 62, 73.)  This

1  was Petitioner's ninth parole hearing, and at the time of the Governor's reversal he had served 22

2  years and nine months in prison, on a five years to life sentence. (Id. at 67.)  Thus, Petitioner has

3  served well above the minimum term of his sentence.  He was 19 years old at time of offense,

4  and was 48 years old at time of Governor's reversal. (Id. at 41.)  Petitioner has repeatedly and

5  unequivocally accepted responsibility for his life offense and expressed genuine remorse.[2]

6  Petitioner has no prior criminal history and none for the five to six years that he was a fugitive.[3]

7  During his entire twenty plus years of incarceration, Petitioner has suffered only two rules

8  violation reports, the last in 1989. (Id. at 37, 72.)  He has strong family ties to Mexico including

9  a deed to the family property, and plans to return there to live with his elderly mother and work

10 on the family farm. (Id. at 27-29, 32-33, 54.)  In addition, Petitioner has other solid plans of

11 employment in Mexico including a letter from a friend who offered employment at a factory and

12 a letter from Petitioner's nephew who offered employment on his mango farm. (Id. at 34-35.)

13 Petitioner has shown substantial rehabilitation by his participation in Alcoholics Anonymous

14 (AA) since 1996, and completion of the Men Against Violence Program. (Id. at 39.)  In addition,

15 Petitioner has exceptional work experience including participation in the PIA furniture factory

16 since 1996, and a number one skill rating and certification as a cabinet maker having completed

17 6,800 hours. (Id. at 38.)  In September 2003, one of Petitioner's supervisors, wrote that

18 ─────────────────────

19      [2] Specifically, at the 2004 hearing, in relating how he felt about the life-offense, Petitioner stated:

20      Well I feel terrible because of the fact that - - I mean I'm 48 years old and I have been
        locked down for 24 years.  There's not a day that goes by that I don't think about it.  I mean the
21      way I see it, my mother lost two sons behind something that happened.  I mean my brother never
        came back. I know there is no - - there is no reason in my - - There is no doubt in my mind that I
22      messed up.  You know I feel sorry and I - -

23 (Exhibit 5, at 17.)

24      [3] With regard to Petitioner's tenure as a fugitive, the BPH stated:

25      We would also note  - - like to note for the record and we feel that it's significant to note
        that when you were arrested for this offense, you were released on your own recognizance and you
26      had the - - It is our opinion that you had the ability to abscond to Mexico if you wanted to, in order
        to avoid prosecution, and you did not.  You remained in the United States and you turned yourself
27      in and faced the offense knowing full - - knowing that there was a great likelihood that you would
        be convicted for this offense."

28 (Exhibit 5, at 69-70.)

1   Petitioner has proven to be self-motivated, displaying maximum efforts, pride, and leadership

2   abilities, and was of the opinion that if "given a chance to work in the private sector, [Petitioner]

3   would exceed any expectations of any potential employer and would be a benefit to society." (Id.

4   at 38-39.)

5       Petitioner's counselor was of the opinion that he posed a low degree of threat if released

6   to the community. (Id. at 40.)  The psychological report, authored by Doctor Madeline Daniels,

7   dated July 30, 2001, stated that Petitioner expressed sincere and genuine remorse for his actions.

8   In addition, it was stated that Petitioner's insight and judgment appear to have significantly

9   improved and during his incarceration he has "matured constructively and that in a less

10  controlled setting, such as a return to the community, he is very likely to hold present gains and

11  continue self-improvement. (Id. at 42-43.)  It was Dr. Daniels opinion that a combination of

12  factors lead to the commission of the life offense "including losing both his brother and his father

13  at an early age, the victim's bragging about killing his brother, the victim's statements that he

14  was going to Mexico to murder another relative of Mr. Benites, and his friend offering him a gun

15  and taunting his manhood if he did nothing was too much for him to handle given his youth and

16  maturity." (Id. at 70.)  To this end, at his 2004 hearing, Petitioner stated that although he knew

17  the victim had killed his brother six years prior in Mexico, he did not became upset to the point

18  of seeking revenge until the victim threatened to return to Mexico to kill a cousin and touting that

19  it was not his first killing-insinuating that he had killed Petitioner's brother.[4]  (Id. at 55-57.)

20      The Governor's finding that the circumstances of the commitment offense went beyond

21  the minimum necessary to sustain a conviction for first-degree murder, even if assumed true, do

22  not on this record, continue to demonstrate that Petitioner currently presents an unreasonable

23  danger to public safety if released.  Based on Petitioner's exceptional institutional record and

24  substantial rehabilitation, reliance on the immutable factors of the commitment offense resulted

25  in a due process violation in this instance.

26      The Governor additionally noted that despite Petitioner's contention that he is remorseful

27

28      [4]  Of note, the BPH indicated that an arrest warrant for the victim's killing of Petitioner's brother was
    present in Petitioner's central file.  (Exhibit 5, at 51.)

and acceptance of responsibility, denied attempting to shoot Mr. Alonzo.  Under Section 5011 of the California Penal Code, "The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate committed."  Cal. Penal Code § 5011.  Likewise, the Governor should not require an admission to guilt before accepting a Board's decision to set a parole date.  See e.g. Hayward, 512 F.3d at 542 ("Under California law, the Governor, in considering whether to reverse a grant of parole by the Board, must consider the same factors the Board is required to consider.")  Moreover, Petitioner has unequivocally accepted responsibility for his life offense of first degree murder.

In closing and in the words of the Presiding Commissioner, "[Petitioner] is not a hardened criminal.  His lack of any criminal conduct either as a juvenile or adult - - as an adult barring his instant offense applauds his upbringing.  He was released on his own recognizance at his preliminary hearing, traveling to Florida with - - to reconcile with his wife, and returning to Fresno to face almost certain conviction for murder.  A fool's decision or one of honor and principle.  He has used his incarceration time wisely, obtained his GED, achieved vocational skills, and has learned a viable and employable profession in the furniture factory.  His exemplary disciplinary history is a credit to his demeanor and lack of criminal traits. [Petitioner] will successfully reintegrate into society when and if given a parole date.  In my considered opinion, [Petitioner] will not be a recidivism statistic, but rather will lead a productive and lawful life in Mexico and benefit society."  (Exhibit 5, at 73-74.)  Based upon this Court's review of the record, the California Supreme Court clearly erred in its application of the "some evidence" standard in denying Petitioner's petition for writ of habeas corpus, and the Governor's reversal of the BPH's finding that Petitioner is suitable for a parole release date should be reversed.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be GRANTED;

2.      The Governor's 2004 reversal of the BPH's finding of suitability for parole be reversed; and,

3.      The parole date set at the 2004 parole hearing be reinstated.

11

1       This Findings and Recommendation is submitted to the assigned United States District

2  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

3  the Local Rules of Practice for the United States District Court, Eastern District of California.

4  Within thirty (30) days after being served with a copy, any party may file written objections with

5  the court and serve a copy on all parties.  Such a document should be captioned "Objections to

6  Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served

7  and filed within ten (10) court days (plus three days if served by mail) after service of the

8  objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

9  636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

10  may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th

11  Cir. 1991).

12

13       IT IS SO ORDERED.

14      **Dated:**    **April 15, 2008**            **/s/ Dennis L. Beck**

15                                      UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28